IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Lewis T. Babcock, Chief Judge

Civil Case No.   05-cv-00851-LTB-CBS

ICG TELECOM GROUP, INC.,

    Plaintiff,

v.

QWEST CORPORATION,

    Defendant.

_____

MEMORANDUM OPINION AND ORDER
_____

Babcock, C.J.

    ICG Telecom Group, Inc. ("ICG") filed this action to compel Qwest Corporation ("Qwest") to arbitrate a dispute that arises between them out of their Interconnection Agreement ("Agreement"), by which their commercial dealings are governed. ICG has moved for a preliminary injunction and Qwest has moved for dismissal. The motions are adequately briefed and oral arguments would not materially aid their resolution. For the reasons stated below, I DENY Qwest's motion to dismiss and DENY ICG's motion for preliminary injunction as moot.

    In its petition for declaratory and injunctive relief, ICG alleged that it had demanded arbitration of a dispute arising under the Agreement and that Qwest refused to arbitrate. The petition contains many of the facts set forth below, to which the parties have stipulated. ICG alleged that I have jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1337 and 9 U.S.C. §§ 2 and 4.

    Qwest doubts that I have jurisdiction to entertain this action. In addition, it argues, and

1

ICG now agrees, that the motion for injunctive relief is moot, as set forth below. Nevertheless, ICG seeks persistence of the action so that it can pursue an award of attorney fees. Jurisdiction to award attorney fees is predicated upon jurisdiction over the underlying action. Therefore, a brief review of the facts is warranted.

## I.  Stipulated facts

The parties have stipulated to the following.

On October 27, 2000, ICG and Qwest entered into the Agreement, which is subject to the 1996 Telecommunications Act ("TCA"). Section (A)3.17 of the Agreement governs dispute resolution. The pertinent provisions state,

> **(A)3.17  Dispute Resolution**
>
> (A)3.17.1  If any claim, controversy or dispute between the Parties, their agents, employees, officers, directors or affiliated agents should arise, and the Parties do not resolve it in the ordinary course of their dealings (the "Dispute"), then it shall be resolved in accordance with the dispute resolution process set forth in this Section. ...
>
> (A)3.17.2  At the written request of either Party, and prior to any other formal dispute resolution proceedings, each Party shall designate an officer-level employee, at no less than the vice president level, to review, meet, and negotiate, in good faith, to resolve the Dispute. ...
>
> (A)3.17.3 If the vice-presidential level representatives have not reached a resolution of the Dispute within thirty (30) calendar days after the matter is referred to them, then either Party may demand that the Dispute be settled by arbitration. Such an arbitration proceedings shall be conducted by a single arbitrator, knowledgeable about the telecommunications industry. The arbitration proceedings shall be conducted under the then current rules of the American Arbitration Association ("AAA"). The Federal Arbitration Act, 9 U.S.C. Sections 1-16, not state law, shall govern the arbitrability of the Dispute. The arbitrator shall not have authority to award punitive damages. All expedited procedures prescribed by the AAA rules shall apply. The arbitrator's award shall be final and binding and may be entered in any court having jurisdiction thereof. ...
>
> (A)3.17.4 Should it become necessary to resort to court proceedings to enforce a Party's compliance with the dispute resolution process set forth herein, and the court directs or otherwise requires compliance herewith, then all of the costs and expenses, including its

>reasonable attorney fees, incurred by the Party requesting such enforcement shall be reimbursed by the non-complying Party to the requesting Party.
>
>...
>
>(A)3.17.6 If the vice-presidential level representatives have not reached a resolution of the Dispute within thirty (30) calendar days after the matter is referred to them pursuant to Section (a)3.17.2 [sic], either Party may invoke, in lieu of the arbitration procedures available in Section (A)3.17.3, the [Public Utility] Commission's Accelerated Complaints procedure in 4 CCR 723-1-61(k) of the Commission's Rules. The Commission's Accelerated Complaints procedure is hereby incorporated by reference. The Parties agree that utilizing the procedure in Section 3.17.2 satisfies the requirements of 4 CCR 723-1-61(k)(1)(b).

The Agreement also provides, in Section (A)3.18, "This Agreement was negotiated by the Parties in accordance with the terms of the Act and the laws of the state where service is provided hereunder. Insofar as and to the extent federal law may apply, federal law will control."

On May 9, 2003, Qwest alerted ICG that it disputed invoices ICG had submitted to it for payment. On September 25, 2003, Qwest also notified ICG of its intention to press for a refund of certain payments it had made previously. On July 2, 2004, ICG invoked the dispute resolution procedures of Section (A)3.17.

Informal negotiations were not fruitful and Qwest informed ICG that it would not consent to arbitrate the disputes. So, on March 14, 2005, invoking Section (A)3.17.3 of the Agreement, ICG filed a demand for arbitration with the American Arbitration Association ("AAA"). Qwest filed an answering statement and a motion to dismiss or stay the arbitration. Qwest denied that the disputes were arbitrable and claimed entitlement to bring the disputes for resolution before the Colorado Public Utilities Commission ("PUC"). Qwest reiterated its refusal to submit to arbitration and stated its intention to file a complaint with the PUC. As

grounds for its fractiousness, Qwest made arguments similar to those it has asserted here.

True to its word, on April 11, 2005, Qwest filed an accelerated complaint against ICG with the PUC. The PUC denied ICG's subsequent motion to dismiss or stay the complaint and scheduled a hearing. That hearing never occurred. On May 10, 2005, I granted ICG's motion for an order restraining the PUC from conducting further proceedings.

On May 17, 2005, Qwest withdrew its motion to stay or dismiss the AAA proceedings and filed a motion to dismiss voluntarily and without prejudice the PUC proceeding. On June 9, 2005, an administrative law judge of the PUC granted Qwest's motion and dismissed the accelerated complaint.

## II. Mootness

Qwest first argues that ICG's petition is moot; having moved for dismissal of the PUC proceeding, Qwest has demonstrated its amenability to arbitration. ICG concedes that, in light of the PUC's dismissal of the accelerated complaint, its request for injunctive relief is moot. However, it seeks reimbursement of attorney fees, costs and expenses pursuant to Section (A)3.17.4 of the Agreement and argues that this action should persist to the extent necessary to make that award.

## III. Jurisdiction

As courts of limited jurisdiction, federal courts may adjudicate only cases that the Constitution and Congress have granted them authority to hear. *See* U.S. Const. art. III, § 2; *Morris v. City of Hobart*, 39 F.3d 1105, 1110 (10th Cir. 1994), *cert. denied* 514 U.S. 1109, 131 L. Ed. 2d 852, 115 S. Ct. 1960 (1995). Because federal courts are courts of limited jurisdiction, there is a presumption against our jurisdiction, and the party invoking federal jurisdiction bears

the burden of proof.  *Penteco Corp. Ltd. Partnership–1985A v. Union Gas Sys., Inc.*, 929 F.2d 1519, 1521 (10th Cir. 1991).

As Qwest points out, the Federal Arbitration Act, 9 U.S.C. §§ 2 and 4, is not a source of jurisdiction but rather a mechanism to be employed in cases over which I otherwise have jurisdiction.  The breach between the mandate of 9 U.S.C. § 4 and the authority to enforce it was explained in footnote 32 of *Moses H. Cone Memorial Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 103 S. Ct. 927, 74 L. Ed. 2d 765 (1983).  The Court there stated,

> The Arbitration Act is something of an anomaly in the field of federal-court jurisdiction.  It creates a body of federal substantive law establishing and regulating the duty to honor an agreement to arbitrate, yet it does not create any independent federal-question jurisdiction under 28 U.S.C. §§ 1331 (1976 ed., Supp. IV) or otherwise.  Section 4 provides for an order compelling arbitration only when the federal district court would have jurisdiction over a suit on the underlying dispute; hence, there must be diversity of citizenship or some other independent basis for federal jurisdiction before the order can issue.

*Id*. at 25 n.32.  The Tenth Circuit, drawing upon that dicta, has stated that the Arbitration Act does not confer federal question jurisdiction upon district courts.  *Comanche Indian Tribe v. 49, L.L.C.*, 391 F.3d 1129, 1131 n.4 (10th Cir. 2004).  *See also*, *National Iranian Oil Co. v. Mapco Int'l, Inc.*, 983 F.2d 485 (3d Cir. 1992); *Rio Grande Underwriters, Inc. v. Pitts Farms, Inc.*, 276 F.3d 683 (5th Cir. 2001); *America's Money Line, Inc. v. Coleman*, 360 F.3d 782 (7th Cir. 2004); *Kehr v. Smith Barney, Harris Upham & Co.*, 736 F.2d 1283 (9th Cir. 1984).

ICG perceives in the TCA an independent basis for jurisdiction, consummating the jurisdictional course of *Moses H. Cone*.  *See*, *Comanche Indian Tribe*, 391 F.3d at 1131 n.4.  It argues that jurisdiction arises both under 28 U.S.C. §§ 1331, because the underlying dispute implicated federal questions under the TCA, and under 28 U.S.C. §§ 1337, because the Agreement governs commerce.

ICG cites *Verizon Md., Inc. v. Global Naps*, 377 F.3d 355 (4th Cir. 2004) in which the court held that the TCA confers federal-question jurisdiction, under 28 U.S.C. § 1331, on federal district courts to decide questions requiring interpretations of telecommunications interconnection agreements.  The court there determined that such disputes arise under federal law because Congress intended by the TCA and the agreements made under it to remove regulations of local telephone markets from the states and to substitute a federal scheme. *Id*. at 366.  I find that reasoning persuasive.  I find and conclude that the TCA provides federal question jurisdiction in this case because resolution would have required interpretation of Section (A)3.17 of the Agreement, subject to the TCA.

Qwest argues that the TCA cannot serve as an independent jurisdictional ground for federal courts to hear disputes in the first instance.  It points out that the TCA gives jurisdiction to federal district courts to hear complaints brought by parties aggrieved as a result of unfavorable determinations by state public utilities commissions.  47 U.S.C. § 252(e)(6).  From this, Qwest concludes that my jurisdiction under the TCA is limited to review of actions that originate before the PUC; Qwest finds implicit in the authority to review substantive and final decisions of the PUC a prohibition against all other exercises of jurisdiction.

For this proposition Qwest cites a number of cases, none of which assist it.  The circuit court authority that Qwest has cited stands only for the unremarkable rule that federal courts have jurisdiction to review various aspects of public utility commission decisions.  *Southwestern Bell Tel. Co. v. PUC*, 208 F.3d 475 (5th Cir. 2000); *Southwestern Bell Tel. Co. v. Connect Communs. Corp.*, 225 F.3d 942 (8th Cir. 2000).  In these decisions, Section 252(e)(6) is viewed as a source of, not a limitation upon, federal district court jurisdiction.

Qwest cites to a handful of district courts that have declined to exercise jurisdiction in the first instance over substantive claims arising out of interconnection agreements. *Intermedia Comm., Inc. v. BellSouth Telecomm., Inc.*, 173 F. Supp. 2d 1282, 1287 (M.D. Fla. 2000); *GTE North Inc. v. McCarty*, 978 F. Supp. 827, 833-835 (N.D. Ind. 1997); *Indiana Bell Tel. Co. v. McCarty*, 30 F. Supp. 2d 1100, 1104 (S.D. Ind. 1998); *AT&T Communs. of Ohio, Inc. v. Ohio Bell Tel. Co.*, 29 F. Supp. 2d 855 (S.D. Ohio 1998); *Bell Atlantic-Virginia v. Worldcom Techs., Inc.*, 70 F. Supp. 2d 620, 626 (E.D. Va. 1999); *Contact Communs. v. Qwest Corp.*, 246 F. Supp. 2d 1184 (D. Wyo. 2003). As the courts have noted, Section 252(e)(6) specifically vests jurisdiction over those disputes in the first instance in state public utilities commissions. Jurisdiction over the prior question whether a commission has authority to resolve the dispute, the question before me, was not implicated.

Qwest also cites several unpublished opinions, of which it has provided no copies. D.C.Colo.L.Civ.R. 7.1(D).

Qwest's argument meets its answer in *Verizon Md. Inc. v. PSC*, 535 U.S. 635, 643-644, 122 S. Ct. 1753, 152 L. Ed. 2d 871 (2002) where the Supreme Court held that 47 U.S.C. § 252(e)(6) does not divest federal district courts of their authority under 28 U.S.C. §§ 1331 to decide federal questions. *Id*. at 643-644. Section 252(e)(6) does not foreclose exercises of jurisdiction about which it is silent. To the contrary, and as the Court stated, 252(e)(6)'s silence leaves the jurisdictional grant of Section 1331 untouched, for "where otherwise applicable jurisdiction was meant to be excluded, it was excluded expressly." *Id*. at 644.

On the most sensible reading of the *Verizon Maryland* decision, divestiture of federal-question jurisdiction is accomplished in the TCA only explicitly. Because Qwest has identified

no provision in the TCA that expressly deprives me of jurisdiction over this dispute, I can only conclude that Congress expected me to exercise jurisdiction in this instance. Nothing in the lower-court decisions Qwest has cited demands a contrary view.

Qwest's argument also begs the question whether the underlying dispute, which the parties have now agreed to arbitrate, might properly come before the PUC at all. Qwest counsels deference to the PUC on the very question of the PUC's authority to pre-empt the arbitration clause. If I have no jurisdiction to decide the arbitrability question except on an appeal from a final PUC decision, then Qwest can, with the PUC's complicity, deny ICG's its bargained-for right to arbitrate. That result would eviscerate the arbitration clause in the Agreement and impede enforcement of the dispute-resolution procedures to which the parties agreed pursuant to the TCA. Congress could not have intended that.

Qwest tries to avoid this circumstance by reading a consent requirement into Section (A)3.17.3 of the Agreement, a reading that rewrites language that appears unambiguous; it chose a proceeding before the PUC in lieu of arbitration, to which election it claims entitlement under Section (A)3.17.6. (Not surprisingly, and of necessity, Qwest finds no consent requirement in the nearly-identical and subsequent language of Section (A)3.17.6.)

To the extent that Qwest contends the language is ambiguous, that argument is easily rejected. The proposed consent requirement, which appears nowhere in the text of the Agreement, would put Section (A)3.17.6 at odds with its predecessor, (A)3.17.3. Qwest attempts to ameliorate this conflict by arguing that (A)3.17.6 trumps (A)3.17.3 by virtue of its placement later in the text. However, the PUC election is to be made only "in lieu of the arbitration procedures available in Section (A)3.17.3." Agreement, § (A)3.17.6. Qwest's

reading of the Agreement would stand that phrase on its head, making the PUC proceeding the primary election in lieu of which arbitration may be chosen by mutual consent.  In addition, the proposed consent requirement would render superfluous Section (A)3.17.4; the enforcement provision presupposes the persistence of the right to arbitrate despite one party's refusal to submit to arbitration.

Sections (A)3.17.3 and (A)3.17.6 must not be read to contradict each other.  Therefore, "either party" must mean the party that first elects a venue – arbitration or proceeding before the PUC.  If consent were required – i.e., if "either party" means "either party regardless of prior elections" – it must be required for both a Section (A)3.17.3 election and a Section (A)3.17.6 election, in which case each party could altogether prevent dispute resolution under the terms of the Agreement.  That cannot be what the parties intended when they entered into the Agreement.

Accordingly, it is ORDERED that

1) Qwest's motion to dismiss is DENIED;

2) ICG's motion for a preliminary injunction is DENIED as moot;

3) ICG shall, on or before **July 11, 2005**, file a brief demonstrating its entitlement to attorney fees and costs and itemizing the amounts it alleges are due; Qwest shall respond on or before **July 25, 2005**; ICG shall reply on or before **August 1, 2005**.

Dated: June 30, 2005, in Denver, Colorado.

BY THE COURT:

  s/Lewis T. Babcock
Lewis T. Babcock, Chief Judge